BALTIMORE & OHIO RD. CO. *v.* McTEER, ADMR.
(Two cases.)

(Decided February 17, 1936.)

*Messrs. Waite, Schindel & Bayless, Mr. Herbert Shaffer* and *Mr. Philip J. Schneider,* for plaintiff in error.

*Mr. Leo J. Brumleve, Jr.,* for defendant in error.

ROSS, P. J. These two cases are proceedings in error from the Court of Common Pleas of Hamilton county, wherein judgments were rendered in favor of the plaintiffs. They were consolidated in the trial court and tried together. The first one is an action for personal injuries, pain and suffering sustained by Charles A. McTeer during the three days prior to his death. Claim is also made for the expenses of his funeral. The other action is for the wrongful death of McTeer. Both actions were brought by the administrator of McTeer, and both charged that Mc-Teer's injuries, death, and the expenditures incident to same, were due to the negligence of the defendant railroad company.

The parties will be designated as they appeared in the trial court.

The evidence develops that McTeer was a *"water station repair man,"* whose duty it was to keep in repair and operation a certain sand-pipe line leading from a blower to a storage tank. This pipe line at certain points was elevated some twenty feet above the ground.

In order to repair this pipe line it was necessary to erect scaffolding upon which McTeer and his helper could stand and work. Such scaffolding had for some time been erected by a carpenter in the employ of the defendant. For many reasons, this method of taking care of the preliminary work was unsatisfactory. McTeer suggested to Cecil L. Lee, who was the "foreman of water stations" and supervised the operation and maintenance of water stations, water heating plants, pumps, motors, engines, pipe lines, sheet metal plumbing and the particular sand line in question, that permanent cross-arms should be erected upon the iron poles carrying the sand line, and that heavy planks could be laid upon such arms, thereby furnishing a permanent walk or scaffold on which those working upon the sand-pipe line could stand and work. It is necessary to consider the construction of this platform in some detail, as it was the construction of same that was approved, in at least a general way, by Lee, the foreman and responsible employee.

The plan proposed and adopted included the use of three upright poles, supporting the sand-pipe line. Some twenty feet from the ground iron cross pieces were attached to these upright poles. They were securely bolted thereto. In two cases where twin poles constituted the support of the sand line the brackets were five feet from tip to tip, and where a single pole was used the bracket was 52 inches from tip to tip. In each case the brackets extended some fourteen

inches outwardly from the pole. The brackets also were slightly turned up on the extremities to prevent planks placed thereon from slipping off. No hand hold or guide rail of any kind or description was provided. Those using the platform provided by the planks laid on the brackets were wholly dependent upon the firmness and strength of the planks for security from a clear fall of almost twenty feet. The first span between the sand-tank ladder and the first pole was 22 feet, the second span was 16 feet, 4 inches, and the third 15 feet, 5¼ inches. Upon the brackets were placed the planks referred to. The first span was bridged by two planks, 22 feet, 5 inches in length, 2¾ inches thick, and 7½ inches wide, placed side by side. Upon the far ends of these planks from the sand-tank rested one plank bridging the second span. It was 16 feet long, 2 inches thick, and 12 inches wide. The plank bridging the third span was 16 feet 1 inch in length, 2 inches thick, and 12 inches wide. It will thus be seen that in the first span the plank was but 5 inches longer than the distance bridged; that in the second span the plank was 4 inches shorter than the span, and that in the third span the plank was 6¾ inches longer than the span.

In the first span the planks were laid in such a manner as to cause a grade upwardly from the sand-tank ladder to the first pole brackets, so that the actual distance covered was really greater than the horizontal distance between the ladder and the pole. The planks, however, were so distributed and adjusted as to cause an overlapping at the extremities where they rested upon the brackets. At such laps, the planks, were nailed together with 3¼ inch spikes or nails. It is immaterial whether Lee, the foreman, actually saw the details of this construction, although he testifies that he inspected it from the ground and asked the man in charge how the planks were fastened.

"Q. While you were there, did you see to what extent they were fastened? A. I didn't see that they were fastened at all.

"Q. Could you see whether there was any bolting there? A. I didn't see any bolting.

"Q. Were they fastened by any bolting so they couldn't move? A. I didn't see any.

"Q. Were they nailed together? A. I didn't see them nailed together, but the man in charge said he had nailed them together.

"Q. What did they look like to you when you looked from the bottom up at them? A. I don't understand.

"Q. How did they appear to you to have been fastened or secured when you were on the ground and looked up? A. From the ground you couldn't see that they were secured at all.

"Q. What did you do to see whether or not they were secured? A. Nothing, just asked the mechanic how he had them fastened and he said he had them nailed good."

The planks were removed after each occasion for their use, but remained in place until the particular job was finished.

There is evidence that the trains passing back and forth caused a vibration which was transmitted to the poles, brackets and planks. The men working upon the planks caused them to move as they exerted themselves in changing the sand pipes. The pipes themselves vibrated to a certain extent, responsive to the effect of the impelling power behind the sand passing through the pipes. All of these things were within the knowledge of the defendant and its employee Lee. So much for the negligence of the defendant. We consider these facts as ample warrant for the jury's finding that the defendant was guilty of negligence in permitting such an unsafe place as

this to exist—in which it permitted the employees to carry on its work.

In addition to this the jury found negligence in the defendant in its answers to certain interrogatories:

### Interrogatory No. 3.

"If your answer to Interrogatory No. 2 is 'Yes,' then you need not answer Interrogatories Nos. 3, 4, 5, 6, 9 and 11.

"If your answer to Interrogatory No. 2 is 'No,' then do you find from the evidence that any employee of The Baltimore & Ohio Railroad Company, excluding Charles A. McTeer and his helper, Mr. Culbertson, was guilty of negligence which directly or proximately caused the injuries to and death of Charles A. McTeer?

"You are instructed to answer this interrogatory either 'Yes' or 'No.' Answer: Yes."

### Interrogatory No. 4.

"If your answer to Interrogatory No. 3 is 'No,' then you need not answer Interrogatory No. 4.

"If your answer to Interrogatory No. 3 is 'Yes,' then state your finding from the evidence the name of such employee of The Baltimore & Ohio Railroad Company, excluding Charles A. McTeer and his helper, Mr. Culbertson, who was guilty of negligence which directly and proximately caused the injuries to and death of Charles A. McTeer. Answer: Cecil Lee."

### Interrogatory No. 5.

"State your finding from the evidence what such employee of The Baltimore & Ohio Railroad Company, excluding Charles A. McTeer and his helper, Mr. Culbertson, did or failed to do which constituted said negligence directly and proximately causing the injuries to and death of Charles A. McTeer. Answer: Cecil Lee failed to properly inspect the scaffold."

Interrogatory No. 11.

"Do you find from the evidence that the accident would have been avoided if 'U' bolts had been used to bolt the boards to the brackets, that Mr. Culbertson suggested their use to Charles A. McTeer the day of the accident, and that Charles A. McTeer failed to use them.

"You are instructed to answer this interrogatory either 'Yes' or 'No.' Answer: 'Yes.' "

We now come to what happened on the day McTeer was injured.

The planks had been in use for some days while McTeer and his helper Culbertson were working upon the sand pipe line. Only a little more work was left to be done. These men were about to resume their work when Culbertson, the helper, called the attention of McTeer to the fact that the planks had slipped from their overlapping position and were no longer safe.

"Q. Just tell what you did and what you said to Mr. McTeer that morning before the accident? A. I told Mr. McTeer that the board had slipped, and he said after giving me a pull on this pipe, bringing the two pipes together that run up and down to the tank, I should get some nails and we would drive them and pull the boards back in shape.

"Q. Did he tell you to get the nails and put them in? A. He told me to get the nails. He didn't say who was to put them in.

"Q. When were the nails to be put in, Culbertson? A. That was up to him.

"Q. Were you to do any work first and then put in the nails, or go get the nails and put them in immediately? A. No, we had to put these two pieces of pipe together first; that is, he wanted to.

"Q. So he told you to come ahead and pull the

pipes together before putting in the nails, is that right? A. That's correct.

"Q. Did Mr. McTeer make any inspection or look over these boards before he went on them that morning? A. Not that I noticed him.

"Q. You didn't see him do anything like that? A. No sir.

"Q. Outside of the shifting you noticed on the ladder, did you notice any other condition of these boards, whether they had slipped off of their brackets or not that morning? A. I noticed on the west end the boards seemed to be extending farther than usual."

If the ordinary rules applied, there could be no question under such evidence that a jury must find contributory negligence upon the part of McTeer.

One of the defenses advanced was sole negligence. As we have pointed out, manifestly this defense is untenable; but that McTeer was in some degree negligent cannot be gainsaid.

Section 9018, General Code, provides:

"In all actions hereafter brought against a railroad company operating a railroad in whole or part within this state, for personal injury to an employee or where such injuries have resulted in his death, the fact that he was guilty of contributory negligence shall not bar recovery when such negligence was slight and that of the employer greater, in comparison. But the damages must be diminished by the jury in proportion to the amount of negligence attributable to such employee. All questions of negligence and contributory negligence shall be for the jury."

This statute was read and properly explained to the jury. No better case could be found for its application. It takes the instant case completely out of the class in which the ordinary rule of contributory negligence applies.

It is contended, however, most vigorously that this and kindred sections have no applicability to the instant case, as such sections are applicable only to moving equipment, such as locomotives, engines, cars, hand cars, rails, and tracks. It is the further contention that Sections 6242, 6243, 6244, 6245 and 6245-1, General Code, are the sections covering any liability imposed upon the railroad in the instant case appertaining to its negligence in the maintenance of standing equipment.

In support of this contention the language of Judge Warrington in the case of *Erie Rd. Co.* v. *Connors,* 261 F., 303, at page 305, is noted:

"Counsel for the company insist that the Metzger Act originated prior to the Norris Act, and is special in the sense that it relates only to railways, while the Norris Act is a general statute, and that the acts are in consequence to be so interpreted as to treat the special statute as an exception to the general statute, relying, for instance, on *Gas Co.* v. *Tiffin,* 59 Ohio St., 420, 441, 54 N. E., 77, and *Doll* v. *Barr,* 58 Ohio St., 113, 120, 50 N. E., 434. Stated in another way, the insistence is that the Metzger Law is exclusive in operation and affords no relief in a case like the instant one. That law concerns defects in railway rolling stock and tracks, which result in injuries to employees while engaged in operating trains, and also railway liability as respects negligence of fellow servants, assumption of risk, and contributory negligence. A synopsis of the sections comprising the law is set out in the margin. If, then, it be recalled that plaintiff's injury was not caused by a defect in rolling stock or track and not received by him while engaged in the operation of a train, it is plain enough—indeed, it is in effect conceded—that he possessed no right to recover at all unless he was within the protection of the Norris Act, and whether he was so protected is a vital question."

Note 3 to *Erie Rd. Co.* v. *Connors, supra,* page 305:
"The Metzger Act (section 9015) forbids companies knowingly or negligently to use or operate cars or locomotives which are in themselves or their attachments defective; if employee receive injury therefrom the company is charged with knowledge of defect, and if defect shown in employee's action for the injury, such showing is made *prima facie* evidence of the company's negligence. Section 9016 provides that in actions by employee's against railways for personal injuries sustained through negligence of the company, 'or any of its officers or employees, or in addition to other liability,' every employee having authority over another shall be deemed the superior and not the fellow servant of such other employee and also of employees in another branch or department who themselves have no power to direct or control. Section 9017 imposes liability for injury resulting to an employee from a defect in any locomotive, etc., which the company had negligently failed to discover, and provides that the injured employee shall not be deemed to have assumed the risk or contributed to his own injury by continuing in the company's employ after knowledge of the defect, and also makes the company liable for injuries sustained by an employee while engaged in operating trains, engines or cars, where such injuries result through the negligence of another employee. Section 9018 takes from the company the defense of contributory negligence, when such negligence was slight and that of the employer greater, and in such cases provides a rule of comparative negligence, further declaring that all questions of negligence and contributory negligence shall be for the jury."

The employee in that case was injured while in an engine pit repairing some defect in the lower part of a locomotive.

On the other hand, to our mind, the inference to be drawn from the language used by Judge Mack in *Nash* v. *Pennsylvania Rd. Co.*, 60 F. (2d), 26, at 27, is more strongly indicative that the act in question here applies:

"In determining the meaning of 'defect or unsafe condition' in Section 6243 and in Section 9017, we must examine also Section 6245 where the same phrase is repeated. In this latter section, relating to assumption of risk, it is clear that these words are contrasted with the words in the preceding clause 'neglect in failing to properly guard or protect'; in other words, a negligent failure properly to guard machinery or plant is not a defect or unsafe condition thereof. The latter phrase therefore evidently relates to some defect or unsafety inhering in the machine or the plant, as, e.g., some break, patent or latent, in the material, some loose board or hole on the floor. In this case, however, neither in allegation nor in proof is a defect or unsafe condition made the basis of the negligence; the charge is not that the hopper or the way or the plant was in any way defective or in an unsafe condition or that the machinery was negligently operated so as to permit or cause the hot sand to overflow, but that a barrier should have been erected to prevent the (impliedly) forseeable sudden overflow of the hot sand to reach the ladder floor opening. Therefore Sections 6243 and 9017, which have to do only with a defect or unsafe condition or with a defect, respectively, are inapplicable."

This latter case also involved an injury incurred in connection with the operation and maintenance of a railroad "sand house." After describing the construction of the sand house equipment, the court says:

"Access to the second story is had by a ladder through a small opening near the edge of the floor, a foot and a half from the nearest hopper. On ascending the ladder at the close of a working day, on July 22, 1929, plaintiff, according to his testimony, was

struck by a rush of hot sand which burned him and thus forced him to release his hold and fall. He suffered a fracture of the heel. In his petition, filed December 7, 1929, the only negligence charged is that the 'defendant failed and neglected to provide any barrier or other protection to keep said hot sand away from the opening.' ''

Now if Section 9017, General Code, has no application to standing or stationary equipment, why did the court find that such section was inapplicable solely because Section 6243 and Section 9017, General Code, "have to do only with a defect or unsafe condition"?

We conclude, therefore, that not only Section 6243, General Code, is directly applicable to the issues here involved, but also that Section 9017 *et seq.,* General Code, are also applicable. Particularly do we consider this true of Section 9018, General Code, which seems to be a section framed in the most general terms.

An independent examination of the two sets of statutes causes us to conclude that there is no foundation for the claim that Sections 6241-1 *et seq.* are the only ones that can be considered generally applicable, and that Sections 9005 *et seq.,* and particularly Sections 9017 and 9018, General Code, are confined to matters involving rolling stock or movable equipment. Sections 9017 and 9018, General Code, are found in 99 Ohio Laws, at page 25. The heading states: ''An Act to Qualify the Liability of Railroad Companies for Injuries to Their Employees.'' Section 9017, General Code, is Section 1 of the act. Section 9018, General Code, is Section 2. The term appliance in Section 9017, General Code, is broad enough to include an appliance by which sand is elevated to a container from which it may be discharged into compartments provided for same in locomotives or tenders.

Where a statute speaks in general terms, courts should hesitate to restrict the meaning of the language

used to a limited area, in the absence of obvious ground therefore found in the statute itself.

The criterion in statutory construction is not what the Legislature intended, but what was the intent of the Legislature in the use of the language employed.

What has been said answers in a general way most of the assignments of error presented.

Without in detail commenting upon the special charges given, we deem it sufficient to say that the general basis for criticism of these charges is found in the conception of the defendant that because McTeer planned and constructed the runway he must assume entire responsibility therefor. He may be guilty of contributory negligence in the use of an obviously defective appliance, but this is not a defense to entire liability on the part of the railroad company which is bound to provide its employees with a safe place to work. The harmonizing of these apparently conflicting responsibilities is definitely assigned by Section 9018, General Code, as a specific task for the jury, which is directed to compare the respective negligence of employee and employer, and make such deduction in compensation as to it seems just. We find no authority to disturb the conclusions of the jury in this matter.

A number of special interrogatories were requested by the defendant, and the same were refused by the court. To list in detail all of these would unduly extend this opinion. All the interrogatories requested and refused, as is true of some of those given, were subject to objection either because they asked for expressions of conclusions on the part of the jury as to probative or evidentiary facts; or they requested expressions from the jury upon conclusions of law. In some instances, at least, the interrogatories given covered the same area defined by some of those refused. See: *Walsh* v. *J. R. Thomas' Sons*, 91 Ohio St., 210, 215, 110 N. E., 454; *Woodruff* v. *Paschen*, 105

Ohio St., 396, 400, 137 N. E., 867; *Mason Tire & Rubber Co.* v. *Lansinger,* 108 Ohio St., 377, 140 N. E., 770; 39 Ohio Jurisprudence, 1158 *et seq.; Brier Hill Steel Co.* v. *Ianakis,* 93 Ohio St., 300, 303, 112 N. E., 1013; 39 Ohio Jurisprudence, 1160.

We have carefully examined the record and the elaborate briefs of counsel and conclude that no error has intervened to the prejudice of the plaintiff in error, and we do therefore affirm the judgments of the Court of Common Pleas.

*Judgments affirmed.*

MATTHEWS and HAMILTON, JJ., concur.